# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| **MARJORIE S. WILSON,** | ) |
| | ) |
| Plaintiff, | )  CASE NO. **18-CV-0745** |
| | ) |
| vs. | )  **JURY TRIAL DEMANDED** |
| | ) |
| **SKU FOODS, LLC; ROBERT STANTON;** | )  **PLEASE HOLD SERVICE** |
| **and OLIVIA KELVIN,** | ) |
| | ) |
| Defendants | ) |

## COMPLAINT

Plaintiff Susie Wilson brings this action for damages and for specific performance against Defendants SKU Foods, LLC, Robert Stanton, and Olivia Kelvin.

## PARTIES AND JURISDICTION

1. Plaintiff Susie Wilson is a citizen and resident of Arkansas.

2. Defendant SKU Foods, LLC ("SKU") is a Missouri limited liability company with its principal place of business located within this judicial district.

3. Defendant Robert Stanton is an individual who is a citizen and resident of Missouri, within this judicial district.

4. Defendant Olivia Kelvin is an individual who is a citizen and resident of Missouri, within this judicial district.

1

5. Venue and jurisdiction in this Court are proper in that Defendants are all Missouri citizens and residents of this judicial district, Plaintiff is a resident of Arkansas, and the amount in controversy in this matter exceeds $75,000. Thus, diversity jurisdiction exists in this matter under 28 U.S.C. § 1332.

## FACTUAL BACKGROUND

***Ms. Wilson Creates "Soozie's Doozies" and Leads It to Tremendous Early Success***

6. Plaintiff Susie Wilson started making cookies in the early 1990's.

7. She worked thousands of hours perfecting her recipe.

8. Over time, her cookies developed a broad and impactful reputation; customers would request the cookies, often informing her they were better than "Mrs. Fields"–brand cookies.

9. In 2003, Ms. Wilson formally launched her business, calling it Soozie's Doozies Gourmet Cookies ("Soozie's Doozies") and filed her registration of the "Soozie's Doozies" trademark.

10. To organize her business operations, Ms. Wilson formed a Missouri corporation, Drooling Enterprises, Inc. ("Drooling"), of which she was the sole owner; Drooling has since been dissolved, no longer exists as an ongoing entity and thus is not a party to this lawsuit.

11. Pursuant to Ms. Wilson's design, she made Drooling the owner of every one of the assets related to the "Soozie's Doozies" business.

12. Drooling owned the equipment used in carrying on the business, title to all registered and unregistered trademarks and trade names, and the goodwill of the business, including the business name ("Assets").

13. Ms. Wilson spent the first half of 2004 developing packaging, logos, and delivery systems, and industrializing stirring and freezing processes.

2

14. Due to Ms. Wilson's marketing efforts and outreach, starting in 2004, Edward Jones, a large nation-wide financial services firm, began buying the cookies for their events and urging their representatives to use Soozie's Doozies for thankyou's, holiday gifts, and other similar marketing purposes.

15. Also in 2004, owing to Ms. Wilson's unique recipe and years of hard work, Soozie's Doozies achieved another landmark of sorts in July of that year – entering the first "Dierbergs Markets" store.

16. By January 2005, the cookies had sold well enough in the first Dierbergs location that Dierbergs decided to carry Soozie's Doozies cookies in all its stores as its "flagship" bakery cookie.

17. Following this tremendous success, by 2005, Ms. Wilson also succeeded in having the "Straub's Markets" grocery chain carry Soozie's Doozies cookies in all its stores.

18. During this time-frame and leading up to September 2007, Ms. Wilson spent most days—10 to 15 hours per day—stirring and scooping enough dough for roughly 4 million cookies, promoting Soozie's Doozies, and increasing its goodwill via the internet and other means.

19. In short, Ms. Wilson devoted essentially *all her time,* seven-days-a-week, to developing and growing the Soozie's Doozies cookie business.

20. By all measures, as of September 2007, the business was a tremendous success and had an extremely bright (and profitable) future.

**Robert Stanton Dupes Ms. Wilson Out of Soozie's Doozies Assets**

21. In or around September of 2007, Defendant Robert Stanton approached Ms. Wilson expressing his interest in helping Ms. Wilson's business to further expand.

22. Mr. Stanton expressed to Ms. Wilson that he could provide certain resources, including capital, to help the business flourish.

3

23. Ms. Wilson was generally impressed by Mr. Stanton's assertions and purported ability to help the business develop, and began discussing in earnest with him the precise mechanics by which they could work together to do so.

24. In every discussion regarding these topics, Mr. Stanton consistently told Ms. Wilson that she would "always" be an owner of the Soozie's Doozies business; in fact, Mr. Stanton favorably compared Ms. Wilson to the "Amos" in the "Famous Amos" cookie brand, or even "Colonel Sanders," the character behind "Kentucky Fried Chicken."

25. Throughout September and October of 2007, Ms. Wilson and Mr. Stanton discussed how best to move the business forward; much of those discussions were oral, yet many others were written, taking place via electronic-mail correspondence.

26. After discussing multiple options, Ms. Wilson and Mr. Stanton decided that the best plan would be one by which Ms. Wilson would sell the business assets to another entity created by Mr. Stanton in which, importantly, Ms. Wilson also would enjoy an ownership interest.

27. As the founder and long-time developer of Soozie's Doozies Gourmet Cookies, and the person singularly responsible for the brand's popularity and success, Ms. Wilson never would have participated in any transaction in which she did not retain an ownership interest in what was, by all measures, her company.

28. After discussing the issues throughout October 2007, towards the end of the month, the parties agreed upon a framework for a transaction by which Ms. Wilson would authorize the sale of all Soozie's Doozies Assets, for nominal compensation, to a company created by Mr. Stanton, *in which Ms. Wilson would be at least a 10% owner.*

29. The intentions of the parties were memorialized in e-mail correspondence between Mr. Stanton and Ms. Wilson during that time-frame.

30. Particularly, in an October 24, 2007 e-mail to Ms. Wilson, Mr. Stanton offered to form a new limited-liability company ("LLC") into which Ms. Wilson would transfer the business Assets from her private corporation, Drooling.

31.  Mr. Stanton also specifically asserted that Ms. Wilson would own a 10% interest in the new LLC and would receive 10% of the new LLC's annual profits.

32. In addition, Mr. Stanton agreed that Ms. Wilson also would receive 2% of net sales made by the new LLC for the following five years, and an additional 2% for any new customers that Ms. Wilson brought to the new LLC.

33. Also evidencing the fact that Ms. Wilson at all times believed and expected to own part of the new LLC, Ms. Wilson was to receive minimal, if any, direct compensation for transferring her entire company to Mr. Stanton's new LLC.

34. Purportedly to save the parties the expense of hiring legal counsel, Mr. Stanton also asserted that he personally would form the new LLC, and would draft the agreement pursuant to which the sale of the Assets to that new LLC would occur.

35. The day after Mr. Stanton made those representations, via her e-mail response of October 25, 2007, Ms. Wilson indicated that she understood, was in favor of, and agreed to the proposed transaction.

36. At all times following that e-mail correspondence, and at all times leading up to the transaction discussed therein, Ms. Wilson believed that Mr. Stanton, in forming the new LLC, would, as he represented, make her a 10% owner in the entity.

5

37. At some point in time over the following few weeks, Mr. Stanton formed the new LLC the parties had discussed, co-defendant SKU Foods, LLC ("SKU").

38. Also during that time-frame, Mr. Stanton drafted the purchase agreement by which Ms. Wilson would effectuate the sale of the Soozie's Doozies Assets to SKU, the November 12, 2007 Purchase Agreement ("Purchase Agreement"), a true and correct copy of which is hereby attached as **Exhibit A**.

39. Prior to *and* after Mr. Stanton had formed SKU Foods, LLC, and at all times leading up to the execution of the Purchase Agreement, Ms. Wilson believed that she owned a 10% interest in SKU.

40. When presenting the Purchase Agreement to Ms. Wilson, and describing its terms to her, Mr. Stanton portrayed SKU as being the "new LLC" specifically discussed during his October 24, 2007 e-mail and consistently during the weeks intervening between his sending that e-mail and the parties' execution of the Purchase Agreement.

41. Subsequently, believing that she owned a 10% in SKU at the time she did so, Ms. Wilson executed the Purchase Agreement on November 12, 2007.

42. Ms. Wilson executed the Purchase Agreement to consummate the sale of the business assets from Drooling to SKU, of which, due to Stanton's representations, Ms. Wilson was misled to believe she had a 10% interest in.

43. At the time of her execution of the Purchase Agreement, Mr. Stanton was fully aware that Ms. Wilson believed SKU to be the "new LLC" discussed weeks earlier and that she was under the belief that she owned 10% of that entity.

44. As was just recently revealed to Ms. Wilson by Mr. Stanton, Mr. Stanton never actually gave Ms. Wilson *any* ownership interest in SKU.

6

45. Yet, despite knowing that Ms. Wilson was in fact *not* a 10% owner of SKU, and despite knowing that false belief was the only reason she was entering the Purchase Agreement, Mr. Stanton did not speak up to inform Ms. Wilson that she did not, in fact, own any portion of SKU.

46. Rather, through his silence and failure to disclose while having a duty to so disclose, Mr. Stanton fraudulently induced Ms. Wilson to execute the Purchase Agreement.

47. Because of the value to her of the Soozie's Doozie business, Ms. Wilson never would have entered the Purchase Agreement if she had been aware that Mr. Stanton had *not* made her a 10% owner of SKU.

48. Since the execution of the Purchase Agreement, Ms. Wilson, for nearly a decade, continued to work in the business under the belief that she was increasing the value of her 10% ownership interest in SKU.

49. Over the course of the following decade, Mr. Stanton, along with co-defendant Olivia Kelvin, consistently acted as though Ms. Wilson was a part-owner of SKU, as she had been led to believe.

50. Due specifically to Mr. Stanton's and Ms. Kelvin's deceptive actions and false representations, Ms. Wilson, for approximately a decade, never suspected that she did not, in fact, own 10% of SKU.

51. As noted, in the October 24, 2007 e-mail in which Mr. Stanton asserted that Ms. Wilson would own 10% of the new LLC - SKU, he also specified that she would, on an annual basis, receive 10% of SKU's profits *because of* her purported 10% ownership of SKU.

52. Over the years, on an annual basis, Mr. Stanton would make payments to Ms. Wilson that purportedly represented the 10% of SKU's profits consistent with his representations in the October 24, 2007 e-mail and all the additional, consistent, conversations he had with Ms. Wilson thereafter.

53. Mr. Stanton would tell Ms. Wilson that that the payments were being made to her due to her 10% ownership and the 10% profit-distribution they always had discussed (and as was reflected in the October 24, 2007 e-mail).

54. On almost countless occasions, from time to time, if Ms. Wilson ever questioned the timing or amount of those payments, Mr. Stanton would simply tell her that he "was behind," in paying her, and always expressed an intent to pay her additional amounts if it seemed to Ms. Wilson she was receiving less than 10% of SKU's annual profits.

55. For nearly a decade, consistently, the payments Ms. Wilson would receive that were portrayed as representing her 10% ownership of SKU were issued in the form of checks *from* SKU.

56. Due to her belief that she was a part-owner of SKU, and Mr. Stanton and Ms. Kelvin's knowledge of her false belief, for over a decade, Mr. Stanton and Ms. Kelvin continually and fraudulently induced Ms. Wilson to devote an enormous amount of personal effort to the continued development of the Soozie's Doozies business, which included Ms. Wilson contributing her name and likeness to market and promote the brand.

57. Moreover, continuing to be induced to work for Mr. Stanton and Ms. Kelvin under the false belief that she owned 10% of SKU, Ms. Wilson secured the brand's decisive meetings with Walmart and other major distributors of the business's products.

58. It was not until October of 2017, when Mr. Stanton was securing additional investment financing for SKU, that Mr. Stanton *finally* revealed to Ms. Wilson what he had concealed for roughly a decade: despite having told her before forming the business, and for over a decade thereafter and despite continuously acting consistent with the assertion over the course of ten years, Ms. Wilson was *not* a 10% owner in SKU; in fact, as Mr. Stanton finally revealed, Ms. Wilson had *no ownership* interest in SKU.

8

59. Ms. Wilson immediately objected, citing the discussions related to and delineated in the October 24, 2007 e-mail exchange and the years of consistent representations made thereafter, Mr. Stanton offered a bizarre and farcical explanation, telling Ms. Wilson that their earlier agreement concerned some "different," unidentified company *other* than SKU.

60. It was only then that Ms. Wilson finally learned that she not only had been fraudulently induced to execute the Purchase Agreement in 2007, but also had been fraudulently induced to work, for years, on behalf of the company.

**Ms. Wilson's Claims Are Timely**

61. While the fraudulent and negligent acts complained of, and the representations that are the basis for the promissory estoppel claim herein occurred in 2007, despite acting reasonably and diligently, Ms. Wilson never learned that she did *not,* in fact, own 10% of SKU until 2017.

62. Mr. Stanton and Ms. Kelvin both, in all the manners described *supra,* consistently acted as though Ms. Wilson was an owner of SKU for approximately a decade.

63. In addition, in every single instance that Ms. Wilson inquired of Mr. Stanton as to whether she was an owner of SKU, he assured her that she was and that the company paperwork reflected the same.

64. Even further, on multiple occasions, Ms. Wilson even asked to see such paperwork; in every single instance, Mr. Stanton consistently told her that he would show her the paperwork, but would then put off doing so over and over, while at the same time assuring Ms. Wilson that she *was* an owner, until other issues or obligations of the parties become more immediate, allowing Mr. Stanton to ignore the subject until Ms. Wilson would bring it up again, at which time he would repeat the same deceptive routine of adamantly assuring her that she owned 10% of SKU while putting off providing, or claiming he was having trouble "finding," the relevant paperwork.

9

65. Because LLC ownership is not public information, and because of the extreme informational advantage that Mr. Stanton had over Ms. Wilson in this respect, Ms. Wilson had no other reasonable means of determining her true ownership rights in SKU.

66. The most direct manner she had available to do so – demanding to see the paperwork – was always, as mentioned, rebuffed by Mr. Stanton, who assured her either that she did not need to see any paperwork, or that he would produce the same at a future time.

67. Moreover, in every single instance in which Ms. Wilson was introduced to a potential customer by either Mr. Stanton or Ms. Kelvin, she was always consistently introduced as an "owner" of SKU.

68. Likewise, over the years, in several instances, Ms. Wilson, in the presence of Mr. Stanton and Ms. Kelvin, would introduce herself to potential customers as an "owner" of the business; yet, not on a single occasion, did Mr. Stanton or Ms. Kelvin correct Ms. Wilson and/or the potential customers.

69. In short, due specifically to Mr. Stanton and Ms. Kelvin's affirmative actions – continually deceiving Ms. Wilson to believe she was at least a 10% owner of SKU, Ms. Wilson was unable, in the exercise of reasonable and persistent diligence, to discover the fact she had been fraudulently and/or negligently induced into entering the Purchase Agreement in the first place, or to discover the fact that her continued provision of services and her likeness to the company for approximately a decade was done on the basis of completely false facts.

70. Consequently, all of Ms. Wilson's claims are timely because none of her present claims accrued until the discovery, in late 2017, that Mr. Stanton had not, in fact, made her a 10% owner of SKU.

## COUNT I
## FRAUDULENT MISREPRESENTATION --
## INDUCEMENT BY CONCEALMENT

71. The facts and allegations contained in the paragraphs above are incorporated herein by reference.

72. Because of his prior representations and control over the formation of SKU, Mr. Stanton (and then Ms. Kelvin as well) had a duty to disclose Ms. Wilson's lack of ownership in SKU prior to her executing the Purchase Agreement, and prior to allowing Ms. Wilson to continually provide supportive services and work for SKU, and to contribute her name and likeness for SKU's benefit.

73. Despite having an affirmative duty to do so, Mr. Stanton purposely failed to disclose Ms. Wilson's lack of ownership in SKU to convince her: (a) to agree to the Purchase Agreement; and (b) to provide supportive services and work, as well as her name and likeness, for SKU's benefit.

74. At the time that Mr. Stanton and Ms. Kelvin failed to disclose Ms. Wilson's lack of ownership in SKU, Mr. Stanton and Ms. Kelvin were fully aware the failure to disclose such fact was fraudulent and that Ms. Wilson was operating under the false belief that she owned at least 10% of SKU.

75. The non-disclosures by Mr. Stanton and Ms. Kelvin were material to Ms. Wilson's decision: (a) to agree to the Purchase Agreement; and (b) to provide supportive services and work, as well as her name and likeness, for SKU's benefit.

76. When purposely failing to disclose Ms. Wilson's lack of ownership in SKU, Mr. Stanton and Ms. Kelvin intended Ms. Wilson to rely upon their failures to disclose: (a) to agree to the Purchase Agreement; and (b) to provide supportive services and work, as well as her name and likeness, for SKU's benefit.

77. Ms. Wilson relied upon Mr. Stanton's and Ms. Kelvin's failures to disclose at the time she did those acts.

78. At all times that Ms. Wilson relied upon the failures to disclose, despite reasonable care and diligence, Ms. Wilson was ignorant of the fact she did not actually own 10% of SKU.

79. Ms. Wilson's reliance upon Defendant's failures to disclose was reasonable, and Ms. Wilson had the right to so rely.

80. If not for the non-disclosures by Mr. Stanton and Ms. Kelvin that she did not own 10% of SKU, Ms. Wilson never would have: (a) agreed to the Purchase Agreement; or (b) provided supportive services and work, as well as her name and likeness, for SKU's benefit.

81. As a result of Defendants' failures to disclose, and Ms. Wilson's reasonable reliance thereupon, Ms. Wilson was injured and mistakenly entered the Purchase Agreement.

## COUNT II
## NEGLIGENT MISREPRESENTATION --
## INDUCEMENT BY CONCEALMENT

82. The facts and allegations contained in the paragraphs above are incorporated herein by reference.

83. Because of his prior representations and control over the formation of SKU, Mr. Stanton (and then Ms. Kelvin as well) had a duty to disclose Ms. Wilson's lack of ownership in SKU prior to her executing the Purchase Agreement, and prior to continually providing supportive services and working for SKU, and contributing her name and likeness, for SKU's benefit.

84. Despite having an affirmative duty to do so, Mr. Stanton negligently failed to disclose Ms. Wilson's lack of ownership in SKU to convince her: (a) to agree to the Purchase Agreement; and (b) to provide supportive services and work, as well as her name and likeness, for SKU's benefit.

85. At the time that Mr. Stanton and Ms. Kelvin failed to disclose Ms. Wilson's lack of ownership in SKU, Mr. Stanton and Ms. Kelvin were fully aware or, in the exercise of reasonable diligence, *should have*

12

*been aware,* that the failure to disclose such fact was negligent and that Ms. Wilson was operating under the false belief that she owned at least 10% of SKU.

86. The non-disclosures by Mr. Stanton and Ms. Kelvin were material to Ms. Wilson's decision: (a) to agree to the Purchase Agreement; and (b) to provide supportive services and work, as well as her name and likeness, for SKU's benefit.

87. When negligently failing to disclose Ms. Wilson's lack of ownership in SKU, Mr. Stanton and Ms. Kelvin intended Ms. Wilson to rely, or reasonably should have known that she would rely, upon their failures to disclose: (a) to agree to the Purchase Agreement; and (b) to provide supportive services and work, as well as her name and likeness, for SKU's benefit.

88. Ms. Wilson relied upon Mr. Stanton's and Ms. Kelvin's failures to disclose at the time she did those acts.

89. At all times that Ms. Wilson relied upon the failures to disclose, despite reasonable care and diligence, Ms. Wilson was ignorant of the fact she did not actually own 10% of SKU.

90. Ms. Wilson's reliance upon Defendant's failures to disclose was reasonable, and Ms. Wilson had the right to so rely.

91. If not for the non-disclosures by Mr. Stanton and Ms. Kelvin that she did not own 10% of SKU, Ms. Wilson never would have: (a) agreed to the Purchase Agreement; or (b) provided supportive services and work, as well as her name and likeness, for SKU's benefit.

92. As a result of Defendant's failures to disclose, and Ms. Wilson's reasonable reliance thereupon, Ms. Wilson was injured and mistakenly entered the Purchase Agreement.

13

## COUNT III
## PROMISSORY ESTOPPEL

93. The facts and allegations contained in the paragraphs above are incorporated herein by reference.

94. Through the October 24, 2007 e-mail exchange mentioned *uupra,* Mr. Stanton made a promise to Ms. Wilson that he would make her a 10% owner of the LLC he formed for the purposes of receiving the Soozie's Doozies Gourmet Cookies Assets pursuant to the Purchase Agreement.

95. In other words, Mr. Stanton promised that he would make Ms. Wilson a 10% owner of SKU.

96. Ms. Wilson relied to her detriment upon that promise in two ways: (a) by executing the Purchase Agreement and transferring all of the Assets to SKU; and (b) in an on-going fashion for nearly a decade, contributing her labor, expertise, and likeness to develop the Soozie's Doozies Gourmet Cookies business run by SKU.

97. Mr. Stanton expected or should have expected that Ms. Wilson would rely to her detriment upon his promise to make her a 10% owner of SKU.

98. Consequently, because Ms. Wilson is *not* a 10% owner of SKU, unless she is granted at least 10% of SKU's assets and/or entitled to *all* of SKU's assets pursuant to a rescission of the Purchase Agreement, and reimbursed for the value of her service and likeness contributed to SKU both at the time made and as they increased the value of SKU, tremendous injustice will occur.

## CONCLUSION

WHEREFORE, Plaintiff Susie Wilson respectfully asks this court to grant judgment in her favor and against Defendants as follows:

- Declaring the Purchase Agreement null and void;

- Declaratory judgment to transfer all Assets conveyed pursuant to the Purchase Agreement back to Ms. Wilson, and to make Ms. Wilson whole for all profits lost over the past decade, and potentially in future years;

- Awarding Ms. Wilson other equitable relief to the extent that remedies at law are inadequate to make her whole;

- Awarding Ms. Wilson reasonable compensation for her years of service – and the allowance of the use of her name and likeness – for the multiple years during which she operated under the false belief that she owned 10% of SKU;

- Compensatory damages for the full value of the business Assets transferred from Ms. Wilson's wholly-owned entity, Drooling, to SKU, via the Purchase Agreement;

- Punitive damages due to the intentional and grossly negligent nature of Defendants' conduct;

- The costs and expenses of this action, including reasonable attorney's fees;

- Pre-judgment interest; and

- Such other and further relief as this court may deem just and proper.

Respectfully submitted,

**DANIEL F. HARVATH, ESQ.**

By: /s/ *Daniel F. Harvath*
Daniel F. Harvath, #57599MO
**HARVATH LAW GROUP, LLC**
75 W. Lockwood Ave., Ste. 1
Webster Groves, MO  63119
(314) 550–3717
dharvath@harvathlawgroup.com
*Attorney for Plaintiff*

15